**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Venita Brown,

    Plaintiff,        Case No. 1:12-CV-939

   v.           District Judge Barrett

Spring Grove Cemetery,

    Defendant.

**<u>ORDER & OPINION</u>**

 This matter is before the Court upon Defendant Spring Grove Cemetery's Motion for Summary Judgment. (Doc. 22). Plaintiff filed a Memorandum in Opposition (Doc. 26) and Defendant filed a Reply (Doc. 32). Plaintiff was also granted leave to file a Surreply. (Doc. 38).

**I. <u>BACKGROUND</u>**

 Plaintiff Venita Brown is an African American who currently works as a Sales Advisor for Defendant Spring Grove Cemetery. In addition to Spring Grove Cemetery, Defendant also owns Gwen Mooney Funeral Home, which is located next to Spring Grove Cemetery, and Oak Hill Cemetery, which is located approximately twelve miles from Spring Grove Cemetery. Plaintiff is based at Spring Grove Cemetery.

 Defendant's Sales Advisors sell three different kinds of services to customers: "pre-need cemetery services," "at-need cemetery services," and "pre-need funeral services." (Doc. 22-1, Freytag Dec. (2/24/14) ¶ 4). Pre-need cemetery services include burial plots, burial services and memorialization such as monuments and headstones.

(Id, ¶ 5).  Pre-need funeral services include a life insurance policy that is designed to pay for funeral expenses when the customer passes away.  (Id, ¶ 7).  Because the sale of pre-need funeral services involves the sale of a life insurance policy, Sales Advisors who sell pre-need funeral services are required to have an Ohio insurance license.  (Id., ¶¶ 7, 8).  At-need cemetery services include the same services as pre-need cemetery services, but are sold after a person has died.  (Id., ¶ 6).  At-need funeral services are required by law to be sold by licensed funeral directors, and therefore are not sold by Sales Advisors.  (Id., ¶ 4).

Before January of 2010, Sales Advisors at Spring Grove were divided into three teams: pre-need cemetery, pre-need funeral, and at-need cemetery.  (Id., ¶ 8).  Plaintiff worked as a pre-need cemetery Sales Advisor.  (Doc. 27-1, Venita Brown Aff. ¶ 2).

In January of 2010, Defendant combined the three teams of Sales Advisors at Spring Grove into one "Family Service Team."  (Freytag Dec., ¶ 9).  Defendant explains that the Family Service Team was implemented to improve its service to customers.  (Id.)  Defendant explains that customers were able to deal with just one Sales Advisor for all three types of services and were able to establish a relationship with that Sales Advisor.  (Id.)  Defendant explains that the Family Service Team also allowed Sales Advisors at Spring Grove to be able to sell all three services, which presented more and better economic opportunities and incentives.  (Id.)

Sales Advisors could choose to be grandfathered in their current role and not join the Family Service Team.  (Id., ¶ 11).  However, all Sales Advisors who chose to join the Family Service Team were required to obtain their insurance license so they could sell pre-need funeral services.  (Id., ¶ 10).  Several Sales Advisors chose to obtain their

insurance license and join the Family Service Team: Wilma Hochstrasser (Caucasian), Cheri Sulfsted (Caucasian), Deb Fox (Caucasian), Brenda Bernard (Caucasian), Kyle Rentschler (Caucasian), Fred Jones (African American), Tina Jones (African American), and John Sakelos (Caucasian).  (Id.)  Plaintiff was the only Spring Grove Sales Advisor who did not obtain an insurance license.  (Id., ¶ 11).  Plaintiff remained selling only pre-need cemetery services and was not able to work with at-need cemetery customers or be assigned duty days.  (Id., ¶ 12).  On duty days, the on-duty Sales Advisor mans the desk to assist customers who walk in or call in.  (Id.)

On April 29, 2013, Plaintiff obtained her insurance license and chose to join the Family Service Team in October of 2013. (Id., ¶ 13)

In her Second Amended Complaint, Plaintiff brings claims of race discrimination, retaliation, breach of contract, and unjust enrichment.  (Doc. 16).

II.   **ANALYSIS**

   A. **Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party has the burden of showing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

The Sixth Circuit has explained this Court's duty when considering a motion for summary judgment:

> A district court need only consider the evidence presented to it when considering a motion for summary judgment, regardless of whether other potentially relevant evidence exists somewhere in the record. *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379 (6th Cir. 2007). A district court has no "'duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Id.* (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916 n. 7 (5th Cir. 1992)). Thus, "[r]ule 56 allocates that duty to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson*, *supra*, 481 F.3d at 379 (quoting *Skotak*, supra, 953 F.2d at 916 n. 7).

*Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010).

### B. Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against an employee who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a).

#### 1. Race discrimination

Plaintiff has not presented any direct evidence of race discrimination. Where no direct evidence of discrimination exists, a claim of employment discrimination is to be analyzed using the burden-shifting approach first announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). To establish a prima facie

case of discrimination under Title VII, a plaintiff must show that "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *DiCarlo v. Potter,* 358 F.3d 408, 415 (6th Cir. 2004).

If the plaintiff succeeds in establishing a prima facie case, an inference of discrimination arises, and the burden then shifts to the defendant to articulate some legitimate nondiscriminatory reason for its actions. *Burdine*, 450 U.S. at 254-56. If the defendant articulates a nondiscriminatory reason for its actions, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons put forth by the defendant were not its true reasons but were a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802.

The plaintiff may prove pretext by showing either that: (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate the adverse action, or (3) the proffered reason was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). "Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

In her Second Amended Complaint, Plaintiff claims that Defendant discriminated against her in three different ways: (1) Plaintiff was paid less in commissions than Sheila Rutz, who is Caucasian; (2) Plaintiff was not given an opportunity to bid for the

5

Sales Director position, which was awarded to Brad Palmer and Skip Phelps, who are Caucasian; and (3) Plaintiff was told if she accepted the Team Lead position she would not be able to receive commissions, but Pam Deshler, who is Caucasian, was promoted to the Team Lead position and was permitted to sell and receive commissions in addition to her salary.  In her Response to Defendant's Motion for Summary Judgment, Plaintiff also claims that Defendant was discriminatory in the way in which sales leads were distributed.

### a. Commissions

Plaintiff claims that she has been paid less in commissions than a similarly-situated employee, Sheila Rutz.  To qualify as "similarly-situated," an individual "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Hollins v. Atl. Co.*, 188 F.3d 652, 659 (6th Cir. 1999).

Plaintiff claims that since 2009, Rutz has received 6% commissions on sales while Plaintiff only receives a 4% commission.  Plaintiff also claims that Rutz is able to service pre-need and at-need customers, while Plaintiff was limited to servicing pre-need customers.  Finally, Plaintiff claims that Defendant paid for Rutz to obtain her insurance license, but refused to do the same for Plaintiff.

Defendant responds that the "commissions" were actually net monthly sales volume overrides which were part of a compensation plan for Sales Advisors. Defendant explains that all Sales Advisors based at Spring Grove received a 4% override on their net monthly sales volume between $30,001.00 and $100,000.00,

unless their monthly sales volume included a minimum of $10,000.00 in pre-need funeral services and $10,000.00 in cemetery sales, in which case they would instead receive a 6% override on that month's net sales volume. (Freytag Dec. (2/24/14) ¶ 17 & Ex. 1).

Defendant argues that Plaintiff is not similarly situated with Rutz because Rutz was based at Oak Hill, which had a different compensation plan. Defendant explains that Sales Advisors at Oak Hill received a 6% monthly override on monthly net sales volume between $25,001.00 and $100,000.00, regardless of the mix of sales. (Id., ¶ 17). Defendant explains that one of the reasons Spring Grove and Oak Hill had different compensation plans was because Oak Hill does not have an on-site funeral home, which limits sales of pre-need funeral services at Oak Hill. (Id., ¶ 16). Defendant cites statistics for 2013, which show that the Gwen Mooney Funeral Home handled 550 funerals, and of those funerals, 357 used Spring Grove Cemetery, while only 16 used Oak Hill Cemetery. (Id.) Defendant also explains that the cost of burial plots at Oak Hill was less than Spring Grove, and unlike Spring Grove, Oak Hill did not have mausoleum or cremation services. (Id., ¶ 17).

Defendant also explains that the volume of sales at Spring Grove is much larger than the volume of sales at Oak Hill. (Id., ¶ 15). Defendant explains that while Spring Grove typically has about fifteen Sales Advisors, Oak Hill has never had more than three. (Id.) The Sales Advisors at Oak Hill were never divided into teams based on the kids of services sold, and therefore, unlike the Sales Advisors at Spring Grove, the Oak Hill-based Sales Advisors had always been able to sell both pre-need and at-need services. (Id.) Defendant explains that Oak Hill Sales Advisors were not asked to be

part of the new Family Service Team in 2010.  (Id., ¶ 16).  Therefore, unlike the Spring Grove-based Sales Advisors, Rutz was not required to join the Family Service Team to be able sell both pre-need and at-need cemetery services.

Plaintiff disputes Defendant's reasons for having a different compensation plan in place at Oak Hill.  For instance, Plaintiff explains that the cost of cemetery plots at Spring Grove and Oak Hill is similar.  Plaintiff states that cemetery plots at Spring Grove start at $1,950.00 and at Oak Hills cemetery plots start $1,750.00.  (Brown Aff., ¶ 9).  Plaintiff also explains that at Oak Hills, Sales Advisors are able to sell a double space for a husband and wife, which are not available at Spring Grove.  (Id., ¶ 17).

Plaintiff has not established that the differences between the compensation plan at Oak Hill and Spring Grove were based on race discrimination.  Plaintiff worked at Oak Hill when Rutz was on vacation.  (Doc. 29-2, Ex. 36, Sheila Rutz Dep. at 23).  Plaintiff acknowledges that on the occasions she worked at Oak Hill, she was able to sell both pre-need and at-need cemetery services.  (Brown Aff. ¶ 3).  Plaintiff also acknowledges that before Rutz obtained her insurance license, like Plaintiff, Rutz was not able to sell pre-need funeral services.  (Id., ¶ 7).

Plaintiff claims that Defendant refused to pay for her to obtain her insurance license, but paid for Rutz to obtain hers.[1]  However, this claim is not supported by the record.  In her deposition, Plaintiff explained that she did not obtain her license in September of 2009 because it did not "fit into her schedule . . . [b]ecause my aunt died

---

[1]In her affidavit, Plaintiff states that she "could not afford to pay for an insurance license promptly.  The company informed me they would reimburse me after I passed the test."  (Brown Aff. ¶ 13).  However, a party cannot create a genuine issue of material fact by filing an affidavit that essentially contradicts earlier deposition testimony.  *See Penny v. United Parcel Service*, 128 F.3d 408, 415 (6th Cir. 1997) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)).

earlier that year.  I was still trying to close out her estate.  I was still taking some classes at Xavier and it was too much.  So I stopped the process of the pre-insurance license." (Doc. 23, Venita Brown Dep. at 99).  Plaintiff testified that she did not have time to study or take the three-day course to prepare for the test for her license until October of 2012. (Id. at 100, 104).  Plaintiff testified that she had more time available to study after she finished serving as national officer in her sorority.  (Id. at 103).  There is nothing in the record which supports the notion that Plaintiff asked Defendant to cover the cost of obtaining her license and Defendant refused.  Without such evidence, Plaintiff cannot show that Defendant treated her differently than Rutz.

Based on the record before the Court, the Court finds that to the extent that Plaintiff claims she was treated differently from Rutz, any difference was because Plaintiff was based at Spring Grove and Rutz was based at Oak Hill.  Plaintiff has failed to show that this different treatment was pretext for race discrimination.  Therefore, Defendant is entitled to summary judgment on Plaintiff's claim for race discrimination to the extent it is based on the amount of commissions she was paid.

**b.  Sales Director position**

Plaintiff claims that in 2011, she was denied the opportunity to bid for the Sales Director position.  Plaintiff claims that the position was not posted and was given to two Caucasian employees, Brad Palmer and Skip Phelps.  Plaintiff states that she would have applied for the positions if there had been a positing for the job.  (Brown Aff., ¶ 10).

Defendant responds that Patrick Downey was the Director of Sales and Marketing at Spring Grove until his termination on June 17, 2011.  Gary Freytag, Defendant's President and CEO, decided that it was not necessary to fill Downey's

position and did not post his position. (Freytag Dec. ¶ 19). Instead, Freytag decided to operate the cemetery with the four managers who reported directly to Downey prior to his leaving. (Id.) Two of those managers were Skip Phelps, who was the Director of Funeral Planning Services (handling pre-need funeral services), and Brad Palmer, Director of Cemetery Planning Services (handling pre-need cemetery services). (Id.) Neither of these managers was promoted after Downey left, but instead remained in their current positions at the same rate of compensation. (Id.)

In her Sur-reply, Plaintiff clarifies that her discrimination claim is not based on the 2011 decision to operate the cemetery with four managers instead of filling Downey's position. Instead, Plaintiff now claims that she was discriminated against at an earlier time, when she was not considered for sales manager positions in 2009 and 2010. Plaintiff claims that instead of considering her, Defendant promoted Palmer and Phelps into those sales manager positions.

"To make out a prima facie case of race discrimination in the failure-to-promote context, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for promotion; (3) she was 'considered for and denied the promotion'; and (4) 'other employees of similar qualification who were not members of the protected class received promotions.'" *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584-85 (6th Cir. 2009) (quoting *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir.2006)).

Plaintiff has not shown that she was qualified for the sales manager positions in 2009 and 2010. While Plaintiff explains that she was Team Leader in 2007 and 2008 (Brown Aff., ¶ 10), there is nothing in the record which outlines the necessary qualifications for any of the management positions for which Plaintiff claims she was

qualified.  In addition, the Sixth Circuit has recently emphasized that "in a failure-to-promote case, Plaintiff must show not only that she was qualified, but that she was similarly qualified to the employees who were promoted in her stead." *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 468 (6th Cir. 2014) (citing *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011) ("In a failure to promote claim, the emphasis in the fourth element is on the relative qualifications of the plaintiff and the employee who actually received the promotion.")).

Moreover, Plaintiff has not shown that she was considered for the promotion to sales manager and then denied the promotion.  Therefore, Plaintiff has not established a prima facie case of race discrimination based on Defendant's failure to promote her into a sales manager position in either 2009 or 2010.  Therefore, Defendant is entitled to summary judgment on this claim.

### c.  Team Lead position

Plaintiff claims she was treated differently than a similarly-situated Caucasian employee, Pam Deshler.  Plaintiff explains that she applied for a Team Lead position but Defendant informed her that if she took the Team Lead position, she would not be able to receive commissions on sales.  Plaintiff explains further that after Deshler was promoted to the Team Lead position, Deshler was permitted to sell and receive commissions in addition to her salary.  Plaintiff claims that she would have applied for and accepted the Team Lead position, if she had known that she could continue to earn a commission on sales.

Defendant does not dispute that in August of 2007, there was an opening for the position of pre-need cemetery sales team leader.  (Freytag Aff., ¶ 20).  Defendant also

does not dispute that Freytag discussed this position with Plaintiff and explained that it would be a managerial position only. (Id.) Defendant explains that in early 2008, there was an opening for the position of at-need cemetery services team leader. (Id., ¶ 21). This opening was posted. (Id.) Defendant explains that this position was a selling position because at-need cemetery services required much less managerial attention than pre-need cemetery services. (Id.) Deshler and another employee, Roger Brown, applied for the position. (Id.) Plaintiff did not apply for the position or have a discussion with Freytag about the position. (Id.) Freytag awarded the position to Deshler. (Id.)

Plaintiff cannot establish a prima facie case of race discrimination based on Defendant's failure to promote her into the either of the team leader positions. Plaintiff did not apply for the positions, and therefore she was not considered for the positions. Accordingly, Defendant is entitled to summary judgment on this claim.

### d. Sales Leads

Plaintiff explains that sales leads were distributed by Phelps, Deshler and Palmer. (Brown Aff. ¶ 12). Plaintiff claims that the leads given to her usually had no phone numbers and bad addresses. (Id.) Plaintiff also claims that the leads given to her were from one zip code, which includes the poorer neighborhoods. (Id.) Plaintiff learned from four of the other Sales Advisors that they were able to make sales from their leads. (Brown Dep. at 24, 28-29). Plaintiff complained to Phelps, Deshler and Palmer. (Id. at 26.) Deshler and Palmer explained to Plaintiff that leads are distributed to the list of Sales Advisors in the order that they are received. (Brown Dep. at 25-27). In her deposition, Plaintiff stated that she did not have any information or knowledge that the leads were distributed based on race. Without more, Plaintiff cannot rely on her

12

subjective beliefs that leads were distributed by Phelps, Deshler and Palmer based on race.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (explaining that a plaintiff's "conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law.").

Next, Plaintiff claims that Defendant made two different changes regarding the policy on the "jurisdiction" for sales which resulted in losses in her database of contacts. Plaintiff explains that she had developed a database of over 10,000 contacts.  (Brown Aff., ¶ 14).  However, in 2008, Defendant limited Sales Advisors to 150 "protected" customers.  (Id., ¶ 15).  For a customer to be "protected," the Sales Advisor needed to make a sale or specific contact with the customer within the past thirteen months.  (Id.) Plaintiff explains that in 2011, that time period was changed to six months.  (Id.)  Plaintiff explains that because her database was limited to 150 active customers, she lost commissions.  (Id., ¶ 18).

Defendant responds that because Plaintiff was not a part of the Family Service Team, she could not sell pre-need funeral services or at-need cemetery services to customers.  Plaintiff does not claim that the implementation of the Family Service Team was based on race.  (Brown Dep. at 95).  In addition, Plaintiff does not dispute that she could not sell at-need services, and her inability to sell these services meant that she lost customers.  (Brown Aff., ¶¶ 20, 24).

Plaintiff has submitted the affidavit of Preston Charles, who is Vice President of Thompson Hall Jordan Funeral Home.  (Doc. 29-1, Ex. 30).  Charles states that he referred clients to Plaintiff during the period of 2009 to 2012, but "[o]n numerous occasions during this period of time, the clients I referred to Venita Brown informed me

that when they contacted Spring Grove Cemetery, Venita Brown was not available or they had to talk with other employees of Spring Grove, rather than Venita Brown." (Id., ¶ 6).  Plaintiff has also submitted the affidavit of Jeanne Davis, who states that she met Plaintiff in 2004 when she purchased a cemetery plot for her mother.  (Doc. 29-1, Ex. 31, Jeanne Davis Aff., ¶ 1).  Davis explains that when her mother later passed away and she contacted Spring Grove Cemetery, she was referred to Janice Gibson.  (Id., ¶ 3).  Similarly. Vernice Appling states that she purchased a cemetery plot for her mother through Plaintiff, but when she contacted Spring Grove after her mother had passed away, she was referred to another person.  (Doc. 29-1, Ex. 32, Vernice Appling Aff. ¶¶ 3-5).

There is nothing in these affidavits which demonstrates that Defendant assigned sales leads or customers in a discriminatory manner.  Charles describes clients who contacted Spring Grove Cemetery before Plaintiff obtained her insurance license and joined the Family Service Team.  Charles does not state whether these clients were seeking pre-need or at-need cemetery services.  Plaintiff does not dispute that before she joined the Family Service Team, she would not have been able to sell at-need cemetery services, and the client would have been referred to someone else.  (Brown Dep. at 190).  Similarly, Plaintiff would not have been able to sell services to Davis or Appling because they were seeking at-need cemetery services after their mothers had passed away.  Therefore, even if this Court were to conclude that Plaintiff has established a prima facie case of race discrimination, Plaintiff has not shown that Defendant's explanation that Plaintiff was not assigned sales leads or customers because she was not a part of the Family Services Team was pretext for discrimination.

Finally, Plaintiff claims that even though she would have contact with a sales lead, the Caucasian Sales Advisors would receive the commission.  (Brown Aff, Ex. 19). Plaintiff explains that she appealed the allocation of these commissions over fifty times, but she only won two of these appeals.  (Brown Aff., ¶ 15; Exs. 8-16).  However, Plaintiff has not shown that she was treated differently than similarly-situated, non-protected employees.  There is nothing in the record which shows that Caucasian Sales Advisors who appealed the allocation of commissions on sales were more successful in their appeals.  Therefore, Plaintiff has not established a prima facie case of race discrimination based on her appeals of the allocation of commissions.

As such, Defendant is entitled to summary judgment on Plaintiff's claim in so far as it is based on the distribution of sales leads or customers and the allocation of commissions.

### 2.  Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) the plaintiff engaged in a protected activity under Title VII, (2) the plaintiff's protected activity was known to the defendant, (3) the defendant took adverse employment actions against the plaintiff, and (4) there was a causal connection between the adverse employment action and the protected activity.  *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013).  The Supreme Court has recently explained that with regards to the fourth element: "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or

actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013).

For an employment action to become actionable retaliation "[a] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted). Absent direct evidence of retaliation, claims of retaliation under Title VII are analyzed under the same *McDonnell Douglas/Burdine* evidentiary framework that is used to assess claims of discrimination. *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 544 (6th Cir. 2008).

Plaintiff does not present any direct evidence of retaliation. Instead, in her Second Amended Complaint, Plaintiff claims she was retaliated against after she complained in 2010 to Patrick Downey that she was not given the same opportunity and did not have the same commission structure as Rutz. Plaintiff also claims that in June of 2012 she complained of race discrimination and different treatment through her attorney. (Brown Aff., ¶ 5).

Plaintiff claims that as a result of her complaints, on several occasions Defendant told customers who called for her that she was not available and then would not tell Plaintiff that the customer called for her. However, in her deposition, Plaintiff explained that it was her fellow Sales Advisors who would not tell her that a customer called. (Brown Dep. at 17). Plaintiff explained that the reason "my co-workers would do that to me because they could possibly get the sale and I don't get the sale." (Id. at 17-18). While the acts of her co-workers may have been selfish, they were not retaliatory.

16

Therefore, there is no causal connection between these acts and Plaintiff's complaints of race discrimination.

In her response to Defendant's Motion for Summary Judgment, Plaintiff adds a claim that she was retaliated against when she was denied lateral transfers to two of the funeral homes owned by Defendant. (Doc. 26, at 9).[2] Freytag explains that in late 2013, Diana Zerusen was assigned as a Sales Advisor at the newly-acquired Gwen Mooney-Miller Funeral Home on Central Parkway, and Ronald Schwartz was assigned to the Gwen Mooney-Eldon Good Funeral Home in Hyde Park. (Doc. 32-1 Gary Freytag Dec. (5/5/14), ¶ 3). Freytag explains that Zerhusen and Schwartz gave up duty days at Spring Grove in taking these assignments, but are in the same compensation plans as Spring Grove. (Id.) Freytag explains that neither Plaintiff nor any of the Caucasian Sales Advisors at Spring Grove were considered for these assignments. (Id.)

The failure to hire Plaintiff into one of these positions is not an adverse employment action. As the Sixth Circuit has explained: "where the sought position is a lateral transfer, without additional material benefits or prestige, it would be improper to conclude that the denial of such a transfer would be a materially adverse action." *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004); *see also Momah v. Dominguez*, 239 Fed.Appx. 114, 123 (6th Cir. 2007), *vacated and remanded on other grounds*, 549 U.S. 1106 (2007) ("a purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes.").

---

[2]As a point of clarification, Plaintiff's Response refers to these positions as "manager" positions, but in her Affidavit Plaintiff refers to the positions as Sales Advisors. (Brown Aff., ¶ 23).

Similarly, Plaintiff's claim that she "was not permitted to work at Oak Hill from November 2012 until March 2014" (Brown Aff. ¶ 22) does not support a claim for retaliation. Plaintiff has not demonstrated that working at Oak Hill would result in an increase in title, pay or benefits. Therefore, the failure to permit Plaintiff to work at Oak Hill was not an adverse employment action. *Accord Blackburn v. Shelby Cnty.*, 770 F. Supp. 2d 896, 927 (W.D. Tenn. 2011) (plaintiff failed to establish an adverse employment action where she offers no evidence that a reassignment out of the criminal courts division would have resulted in an increase in rank, pay, or benefits).

Finally, Plaintiff claims that she was retaliated against for her race discrimination complaints made in 2012 when Defendant did not hire her for a Team Lead position at Oak Hill. (Brown Aff ¶ 8, 23). Freytag explains that Heidi Bruzina was selected for the Oak Hill Team Lead position on November 21, 2013. (Freytag Dec. (5/5/14), ¶ 4). Freytag explains that this Team Lead position was previously held by David Simon, who was awarded the job in late 2012, after it was posted on November 21, 2012. (Id. & Ex. A). Freytag explains that when Simon was hired, Bruzina had also applied for the position. (Id.) Plaintiff did not bid on the position. (Id.) Freytag explains that even though Simon was selected for the position, Bruzina was considered a very strong candidate at that time. (Id.) Freytag explains that when Simon left the position in late 2013, Defendant offered the position to Bruzina, and she accepted it. (Id.) Defendant did not post the position in 2013, and did not consider Plaintiff or any of the other Spring Grove sales advisors for the job. (Id.)

Defendant's failure to promote Plaintiff to the Team Lead position at Oak Hill is not an adverse employment action under the circumstances. "Not receiving a

promotion for which one did not apply would not dissuade a reasonable worker from engaging in protected conduct, and accordingly does not constitute a materially adverse action." *Vaughn v. Louisville Water Co.*, 302 Fed.Appx. 337, 348 (6th Cir. 2008).

In summary, Plaintiff has failed to establish a prima facie case of retaliation under Title VII. Therefore, Defendant is entitled to summary judgment on this claim.

## C. Breach of contract

In her Amended Complaint, Plaintiff claims that Defendant promised her five weeks of vacation, but Plaintiff has only received two weeks of vacation for the past three years in violation of the promises made by Defendant. Plaintiff also claims that Defendant breached their contract when they failed to notify her of delinquent accounts. Plaintiff did not respond to Defendant's Motion for Summary Judgment on these claims. Therefore, the Court considers this claim abandoned. *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (citing *Hicks v. Concorde Career Coll.*, 449 Fed.Appx. 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment)).

Plaintiff has still maintained her claim that Defendant breached its promise that she could keep her database and continue to service her clients on a pre-need and at-need basis as long as she was employed with Defendant. However, in response to Defendant's Motion for Summary Judgment, Plaintiff now speaks of this claim in terms of a promissory estoppel claim.

19

Under Ohio law, the elements of promissory estoppel are: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *McCroskey v. State*, 456 N.E.2d 1204, 1205 (Ohio 1983) (citing Restatement of the Law 2d, Contracts (1973), Section 90).  Ohio courts have held that an employee cannot maintain a claim for promissory estoppel where there is no evidence that the employee turned down any other job opportunities subsequent to the employer's promise.  *Simonelli v. Anderson Concrete Co.*, 650 N.E.2d 488, 495 (Ohio Ct. App. 1994) (citing *Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1131 (Ohio Ct. App. 1991) (bare assertion that employee gave up opportunities at other employment insufficient to invoke promissory estoppel where evidence shows employee neither looked for other employment following alleged representations nor turned down any offers of employment).  Plaintiff has presented nothing more than a bare assertion that she gave up other employment opportunities based on Defendant's promise that she could keep her database and continue to service her clients on a pre-need and at-need basis as long as she was employed with Defendant.  Therefore, Defendant is entitled to summary judgment on Plaintiff's claims of breach of contract and promissory estoppel.

### D. Unjust enrichment

Plaintiff did not respond to Defendant's Motion for Summary Judgment on this claim.  Therefore, the Court considers this claim abandoned and Defendant is entitled to summary judgment on this claim.

III.    **CONCLUSION**

Based on the foregoing, Defendant Spring Grove Cemetery's Motion for Summary Judgment (Doc. 22) is **GRANTED**.   This matter shall be **CLOSED** and **TERMINATED** from the docket of this Court.

IT IS SO ORDERED.

_____ */s/ Michael R. Barrett* _____
JUDGE MICHAEL R. BARRETT